ALLEN, Judge.
The Circuit Court of Pasco County quashed a writ of certiorari which had been issued to review an order entered by the Commissioner of Agriculture against a citrus fruit dealer.
Section 601.67, Florida Statutes, F.S.A., authorized the Commissioner of Agriculture, after notice and hearing, to revoke or suspend the license of any citrus fruit dealer if he determines that such dealer has violated any of the provisions of the Florida Citrus Code.
Section 601.64, Florida Statutes, F.S.A., makes it unlawful in connection with any transaction relative to the purchase, handling, sale and accounting of sales of citrus fruit:
*346 “(4) For any citrus fruit dealer to make, for a fraudulent purpose, any false or misleading statement concerning the condition, quality, quantity, or disposition of, or the condition of the market for, any citrus fruit which is received by such citrus fruit dealer or bought or sold or contracted to be bought or sold by such citrus fruit dealer; or the purchase or sale of which is negotiated by such citrus fruit dealer; or to fail or refuse truly and correctly to account and make full payment promptly in respect of any such transaction in any such citrus fruit to the person with whom such transaction is had, or to fail or refuse on such account to make full payment of such amounts as may be due thereon, or to fail without reasonable cause to perform any specification or duty express or implied arising out of any undertaking in connection with any such transaction;”
Section 601.66, Florida Statutes, F.S.A., provides that:
“Any person complaining of any violation of any of the provisions of this chapter by any citrus fruit dealer during any shipping season may at any time prior to the expiration of ninety days immediately following the end of such shipping season apply to the commissioner by complaint, which shall briefly state the facts; whereupon, if in the opinion of the commissioner the facts therein contained warrant such action, a copy of the complaint thus made shall be forwarded by the commissioner to the citrus fruit dealer, who shall be called upon to satisfy the complaint or to answer it in writing within a reasonable time to be prescribed by the commissioner. After an opportunity for hearing on a complaint, the commissioner shall determine whether or not the citrus fruit dealer has violated any of the provisions of this chapter. If, after hearing on a complaint made by any person under this section, the commissioner determines that the citrus fruit dealer has violated any provisions of this chapter, he shall, unless the offender has already made reparation to the person complaining, determine the amount of damage, if any, to which such person is entitled as a result of such violation and shall make an order directing the offender to pay to such person complaining such amount on or before the date fixed in the order. If any citrus fruit dealer does not comply with an order for the payment of money within the time limited in such order, the complainant, or any person for whose benefit such order was made, may within ninety days from the date of the order, file in any court of competent jurisdiction complaint, setting forth briefly the causes for which he claims damages and the order of the commissioner in the premises. Such suit in such court shall proceed in all respects like other civil suits for damages except that the successful party in the proceedings before the commissioner of agriculture shall not be liable for costs in such court nor for costs in any subsequent stage of the proceedings, unless they accrue upon his appeal. In any suit between the same parties involving the same facts as were involved in a proceeding under this chapter, the findings and order of the commissioner hereunder shall be prima facie evidence of the facts-herein stated, and in any such suit if the party who was successful before the commissioner of agriculture finally prevails, he shall be allowed a reasonable attorney’s fee to be taxed and collected as a part of the costs of the suit.”
Section 601.68, Florida Statutes, F.S.A.,. provides:
“The commissioner may instigate and make investigation of any citrus- *347 fruit dealer whom he has reason to believe has violated any law of Florida governing and applicable to citrus fruit dealers and, whenever the commissioner determines after notice to the citrus fruit dealer and hearing that any citrus fruit dealer has violated any law of the state governing and applicable to citrus fruit dealers, he may publish the facts and circumstances of such violation and, by order, suspend the license of such offender for a specific .period or revoke the same or make such other appropriate order as he may deem just and proper, and any such order shall specify the effective date thereof and any order other than one suspending or revoking a license shall automatically suspend such license until said order is complied with. Any action of the commissioner with reference to the revocation or suspension of any license granted under the provisions of this law may be reviewed by any court of competent jurisdiction; ij< ‡ >fc »
The appellee, E. B. Conoley, trustee, filed the following complaint with the Commissioner of Agriculture:
“Fishback, Williams, Davis & Dominick “Attorneys and Counsellors at Law “170 East Washington Street “Orlando, Florida.
“January 27, 1956
“Honorable Nathan Mayo “Commissioner of Agriculture “Citrus & Vegetable Inspection Division
“Winter Haven, Florida
“Re: E. B. Conoley, as Trustee for Barbara Jean Pell, Mildred Joyce Pell, Robert William Pell, Shirley Ann Pell, Eloise Fishback, Mary Jo Fishback, H. D. Fishback and Annie Jean Fishback; and S. E.
Conoley, as Trustee for Connie Conoley,
Complainants, vs. Townsend Fruit Company, Inc., and Driskell Townsend
“Dear Mr. Mayo:
“Mr. E. B. Conoley, as agent for the complainants, on January 3 entered into contract with Townsend Fruit Company, Inc. to sell 4,000 boxes fruit at $1.60 per box on the tree. A copy of this contract is attached hereto and made a part hereof.
“Townsend Fruit Company picked 4,118 boxes of fruit between January 6, 1956 and January 16, 1956, and thereby became indebted to the complainants in the sum of $6,588.80, of which $500 was paid to the complainants when the contract was made. No further monies have been received by complainants. We will be glad to furnish you further information that you may request, but we wanted to make this complaint to your office so that you might take appropriate action. Yesterday we filed a complaint in the Orange County Circuit Court on this transaction and have voluntarily dismissed the same today so that you might have jurisdiction of the complaint.
“Very truly yours,
“Sgd/ Julian K. Dominick “Julian K. Dominick
“JKD/aj
“Enclosures
“cc: Mr. E. B. Conoley
“Orlando Garden Road “Orlando, Florida.”
(Attached contract)
“Townsend Fruit Company, Inc. “P. O. Box 708 Dade City, Florida Phone 26 Blue
*348 “Agreement between E. B. Conley (sic), Agent, Address — Orlando, Florida, (hereafter called “Grower”) and Townsend Fruit Co., Dade City, Florida, (hereinafter called “Buyer”.),
“Witnesseth That, subject to the terms and conditions hereinafter set forth, the Grower hereby sells and delivers and the Buyer purchases from the Grower all oranges now growing or to be grown during the 1955-1956 citrus fruit season on the grove located and identified (sic) as follows:
From City o£
Name of Grove Miles County: Section Township 13 acre block Ferndale, Fla. Lake
Estimated Range Quantity 4000 Boxes
“The Purchase price shall be $1.60 per box on tree.
“Grower acknowledges receipt of $500.00 as part payment of said purchase price; the balance shall be paid when fruit is gathered.
“Grower shall allow Buyer until Jan. 10, 1956 to remove fruit, or a reasonable time after fruit reaches maturity suitable for concentrating. Fruit sold herewith shall at time of delivery be merchantable, free of frost and dryness and of the maturity required for frozen concentrate. If due to any cause, Buyer does not receive sufficient boxes of fruit to liquidate said cash payment, the Grower shall repay the Buyer the deficiency, upon demand.
“Buyer, its agents and employees shall have the right of ingress and egress to said groves properties at all times for the purpose of inspecting and/or the removal of said fruit.
“In the event strikes, lockouts, embargoes, quarantines, acts of God or any other conditions beyond the control of the Buyer and prevent the Buyer from picking the fruit, the Buyer shall have the additional time required therefor.
“Grower warrants that he will not cause said groves to be fertilized or sprayed so as to injury the qualit}' of said fruit or cause it to drop. He shall properly cultivate, fertilize, spray and dust said groves and fruit in a first class and husbandlike manner. He further warrants that said fruit has not been sold and that he has the sole right to said fruit and that there are no existing liens or contracts which will in any way affect the Buyer’s rights hereunder.
“In Witness Whereof the parties hereto have hereunto executed this agreement in person or by their duly authorized agent this 3 day of January, 1956.
“/S/ E. B. Conoley “Grower
“/S/ Driskell Townsend “Its Authorized Agent Buyer”
On receipt of the complaint, the Commissioner issued the following notice:
“To: Townsend Fruit Company, Inc. “P. O. Box 708 “Dade City, Florida
“A complaint against you as a Citrus Fruit Dealer has been filed with the Commissioner of Agriculture, under the provisions of the Florida Citrus Code of 1949, by Julian K. Dominick, Attorney for E. B. Conoley, Agent. “This Complaint sets forth that: You have failed and refused truly and correctly to account and make full payment promptly for citrus fruit purchased from the petitioner during the 1955-1956 season.
“Pursuant to Chapter 601.66, Florida Statutes [F.S.A.], a copy of this complaint is hereby referred to you and *349 you are called upon to satisfy the complaint or to answer the same in writing to the Commissioner of Agriculture not later than Feb. 4, 1956.
“Your prompt attention will be appreciated.
“Yours very truly,
“Sgd/ Nathan Mayo “Commissioner of Agriculture
“By Sgd/ J. F. Mays “Duly Designated Officer “Enclosure
“CC to: American Fire and Casualty Company
“c/o Jas. F. Croley, Agent “Dade City, Florida
“Florida Citrus Commission
“Julian K. Dominick, Attorney.”
The following answer was filed by the appellants:
“Honorable Nathan Mayo “Commissioner of Agriculture “Citrus & Vegetable Inspection Division
“P. O. Box 1072 “Winter Haven, Florida
“Re: E. B. Conley (sic), as Trustee for Barbara Jean Pell, Mildred Joyce Pell, Robert William Pell, Shirley Ann Pell, Eloise Fishback, Mary Jo Fishback, H. D. Fishback and Annie Jean Fishback; and S. F. Conoley, as Trustee for Connie Conoley,
Complainants, vs. Townsend Fruit Company, Inc. and Driskell Townsend
“Dear Mr. Mayo:
“Please consider this the Answer of Townsend Fruit Company, Inc., and Driskell Townsend to the above styled Complaint a copy of which was furnished on January 28, 1956.
“Townsend Fruit Company, Inc., and Driskell Townsend deny that any contract was entered into between the Townsend Fruit Company, Inc., and E. B. Conoley, as agent or otherwise on January 3, or on any other date for the purchase of any fruit at any price. To explain further this statement, Driskell Townsend avers that on or about the above mentioned date, one Ed. Hudson, a fruit broker, offered the Townsend Fruit Company a contract with said E. B. Conoley at the above price of $1.60 per box and was advised that the Townsend Fruit Company would purchase said fruit at this price provided the contract contained a February 15th, 1956, picking date. That said Ed Hudson advised that he would ascertain if such a picking date could be included and would later advise Driskell Townsend. That several days later Ed Hudson advised that he could not arrange a February 15th picking date and that the fruit was sold to one D. R. Hughes, 111 East Magnolia, Lakeland, Florida, by a Mr. Frazer Hull, a fruit broker.
“Answering the second paragraph of this Complaint, Townsend Fruit Company and Driskell Townsend, deny that they or he picked 4,118 boxes of fruit between January 6, 1956 and January 16, 1956, or that they or he picked any fruit whatsoever at any time or that any equipment belonging to Townsend Fruit Company or Driskell Townsend has been in or near the grove of complainant’s during the year 1956. Townsend Fruit Company and Dris-kell Townsend further deny that they or he is indebted to Complaints (sic) in the sum of $6,588.80 and further deny that the sum of $500.00 was ever paid by either Townsend Fruit Com *350 pany or Driskell Townsend or by anyone on the behalf of either of them.
“Driskell Townsend, from an investigation made after receipt of a copy of this Complaint, says that he has learned that the alleged fruit was picked and hauled by said D. R. Hughes and was delivered to the Adams Packing Company. That all equipment and picking tickets and receipts used in said grove were that of said D. R. Hughes with whom Townsend Fruit Company, Inc., or Driskell Townsend has no connection.
“Further answering this Complaint in its entirety, the Townsend Fruit Company, Inc., and Driskell Townsend says that in the event the fruit has not been paid for, that the Complaint should be directed to said D. R. Hughes, Ed. Hudson and Frazer Hull. That same should be dismissed against the Townsend Fruit Company, Inc., and Driskell Townsend but that in the event that it is not so dismissed, that a hearing as to the truth of the allegations in the Complaint and this Answer be held for the purpose of ascertaining such facts.
“Yours very truly,
“Larkin & Larkin “By Sgd/ E. B. Larkin
“cc: Mr. Julian K. Dominick “Florida Citrus Commission
Attorneys for Townsend Fruit Company and Driskell Townsend”
“American Fire & Casualty Co.
The Commissioner, at the conclusion of the hearing, entered the following order:
“Before the Commissioner of Agriculture of the State of Florida
In Re:
Complaint of E. B. Conoley, as Trustee,
Petitioner, vs. Townsend Fruit Company, Inc., and Driskell Townsend, Respondents. citrus fruit dealer under the code. Respondents denied the claim, whereupon hearing was duly held pursuant to the Code, at which hearing sworn testimony was adduced by and on behalf of the parties. Such testimony has been transcribed and, together with all other files in the matter, transmitted to the undersigned Commissioner for consideration and entry of appropriate order. The Commissioner has carefully examined and considered the entire record.
“In the above matter petitioner, E. B. Conoley, as Trustee, on January 27, 1956, pursuant to Section 66 of the Florida Citrus Code [F.S.A. § 601.66], made complaint against Townsend Fruit Company, Inc., and Driskell Townsend, alleging that respondents were indebted to petitioner in the sum of $6,088.80, with respect to a transaction involving the sale of citrus fruit by petitioner to respondents. Townsend Fruit Company, Inc., is a
“Petitioner and Townsend Fruit Company, Inc., entered into a written contract on January 3, 1956, whereby petitioner sold to the company his oranges located on his 13 acre block at or near Ferndale, Florida, estimated at 4000 boxes, at the purchase price of $1.60 per box on the tree. $500.00 was paid to petitioner as deposit at the time the contract was executed. The contract was negotiated with petitioner by one Ed Hudson, acting as *351 agent for Townsend Fruit Company, Inc.
“Picking of the fruit started three days after the contract was signed and in all 4,118 boxes were picked.
“It appears from the rather meager record of testimony adduced in the matter, that one D. R. Hughes, got the fruit from petitioner’s grove, but it is equally true that the fruit undoubtedly was picked pursuant to, and by virtue of, the contract aforesaid. And it is also true that petitioner has not been paid for his fruit except the original deposit of $500.00.
“Just what the hook-up between Townsend Fruit Company, Inc., and D. R. Hughes was, is not very clear from the record, but the undersigned Commissioner is satisfied from what does appear in the record that the fruit in question was picked because of the contract of sale signed by petitioner and Townsend Fruit Company, Inc.
“It follows that petitioner’s claim in the sum of $6,088.80 must be upheld.
“Order
“In accordance with the foregoing findings, which are herewith adopted as findings of fact by the undersigned Commissioner, it is hereupon
“Ordered that respondent Townsend Fruit Company, Inc., do pay to petitioner, E. B. Conoley, as Trustee, the sum of $6,088.80, to be paid on or before fifteen days from the date of this Order, and that in default thereof the citrus fruit dealer’s license of respondent shall stand suspended.
“It is further Ordered that copies of this Order shall be served upon all interested parties to this proceeding, including the Surety Company on respondents’ citrus dealer’s bond.
"Done at Tallahassee, Florida, on this 28 day of May, A. D. 1956.
“Sgd/ Nathan Mayo “As Commissioner of Agriculture of the State of Florida.”
The Florida Supreme Court in the case of Gregg Maxcy, Inc. v. Bateman, 1937, 126 Fla. 747, 171 So. 811, held that:
“Under contract of sale of citrus fruit stipulating that seller ‘has this day sold’ marketable fruit in grove described, ‘said fruit to be purchased at 75 cents per standard field box, on trees, title to marketable fruit passed to buyer though he did not take possession, and buyer was liable for unpicked marketable fruit.”
The Court, in its opinion in the above case, said:
“In this case plaintiff in error bought a crop of citrus fruit from defendants in error. The contract was in the following language:
“ ‘This Contract, Made and entered into this 22nd day of August, 1932, between Sophronia C. Bateman and W. W. Bateman her husband of the City of Wauchula, County of Hardee, State of Florida, parties of the first part and Gregg Maxcy, Inc., of City of Sebring, County of Highlands, State of Florida, party of the second part.
“ ‘Witnesseth, that the party of the first part has this day sold to the party of the second part all marketable oranges and tangerines on the trees in the groves known as the Bateman Grove described as follows:
“ ‘SWJ4 of the SEJ4 and the SE^. of the SWJ4 in Section 25, Township 34, Range 24, Hardee County, State of Florida.
“ ‘Said fruit for the seasons of 1932— 1933 and 1933-34 to be purchased by *352 Gregg Maxcy, Inc., at seventy-five cents (75jS) per standard field box, on trees. In consideration of $300.00 amount acknowledged by party of the first part balance to be paid when and as fruit is picked, it is further agreed that all monies over seventy five cents (75‡) per box net, above all expense handling and brokerage is to be credited to former account of W. W. Bateman. It is agreed by party of the first part that $300.00 is acknowledged on above fruit, as first payment. Witness the hands and seals of the Growers and the corporate name and seal of the Broker the day and date aforesaid.’
“The purchaser failed to gather a part of the citrus fruit purchased, and, as is alleged in the declaration, the purchaser, instead of using 'standard field boxes’ for the gathering of the fruit, used what are called ‘Jumbo boxes,’ which it is alleged held 10 per cent, more fruit than the ‘standard field box,’ and the sellers alleged that by reason of using the box known as the Jumbo box instead of the standard field box, the purchaser took 240 standard field boxes more fruit than was accounted for and owed the seller $180 for that fruit as well as for 800 boxes of fruit which the seller alleged were left on the trees unpicked and unpaid for.
“The contract in this case, except for the fact that there is not in this contract a specific time limit in which the fruit was to be gathered and packed, is not materially different from the contract which we had under consideration in the case of Metcalf v. R. D. Keene & Co., 122 Fla. 27, 164 So. 704, 707. That contract was held to be an indivisible one and was held to bind the purchaser to take the entire crop of fruit at the price named in the contract. In that case Mr. Presiding Justice Ellis, concurring, said:
“ ‘The title to the fruit was in the purchaser from the date of the contract. It was his duty to remove it when it became merchantable. As it became merchantable, the seller was entitled to receive a certain price per box for it. The contract did not secure to the purchaser the right to allow any fruit to become overripe and spoil so as not to be merchantable merely because the contract placed a limit of time upon him within which he should remove it. The reason for the limitation of time is apparent. It secured payment to the seller for all merchantable fruit within a definite time limit, and the prevention of possible infection of his grove by overripe, decaying, and falling fruit.’
“The real contention here is that the title to the citrus fruit which was the subject-matter of the contract did not pass from the seller to the purchaser before the purchaser took possession of the fruit.
“Under authority of the opinion and judgment in the case of Metcalf v. Keene & Co., supra, the circuit judge was correct in holding that the title did pass and in effect that the purchaser was bound to take and pay for the fruit and that the seller was entitled to enforce payment from the purchaser of that fruit contemplated in the contract which was not picked and paid for within a reasonable time and when under prevailing practice in regard to such matters the fruit should have been picked, packed, and shipped.”
We are of the opinion that the findings of the Commissioner that the parties had entered into a binding written contract is amply supported by the record and that, under the above authority, the Commissioner correctly ruled that the fruit crop was purchased by Townsend Fruit Co., Inc.
The appellants contend that under the decisions of the Florida Supreme Court in Mayo v. Market Fruit Co. of Sanford, Inc., Fla.1949, 40 So.2d 555, 557, and Mayo v. *353 Lent, Fla.1950, 45 So.2d 879, the Commissioner did not have authority under the law to determine the validity of the contract and the amount of money due thereunder.
The Supreme Court in Mayo v. Market Fruit Co. of Sanford, Inc., supra, held that the term “account” in the Citrus Code means to pay as well as to furnish a statement showing what is due the grower by the dealer. The Court further held that the Commissioner of Agriculture had improperly ascertained the damages due the grower; and that the statute, making it unlawful for a citrus fruit dealer to fail to account promptly and giving the Commissioner of Agriculture the right to determine the amount of damages and to order dealer to pay such amount or have his license revoked, was not unconstitutional as depriving the dealer of trial by jury, since the Commissioner had no power to enforce collection of the amount of damages found by him to be due.
The above case was appealed to the Supreme Court from an order of the Circuit Judge, after a hearing on a petition for writ of certiorari, quashing an order of the Commissioner of Agriculture.
The Court, in its opinion by Justice Thomas, stated that the complaint against the Market Fruit Company alleged that the grower had sold to the company a crop of citrus fruit approximating 8,000 boxes, part of which was gathered and paid for, part picked and not paid for, and part left to be resold by the grower at a greatly reduced price; the Commissioner, at the conclusion of the testimony, entered an order that required the dealer to pay the grower, within 15 days, the sum of approximately $7,000 or, in default thereof, that his license would stand suspended. The Court stated further that it agreed with the procedure followed and sanctioned the authority invoked by the Commissioner, but that it did not concur in the manner of applying debits and credits in arriving at the amount which the dealer owed at the time. The Court then held that, therefore, such amount was improperly fixed.
The Court further commented that another provision of the contract provided that if the buyer refused to remove the fruit under conditions specified, the advance would be forfeited and no additional payment would be required.
The Court, in its opinion, said:
“The first question we must decide grows out of the construction placed by the Circuit Judge upon the language we have quoted from Section 596.11- — that is, what constitutes a failure or refusal to account in respect of a transaction. Does it mean that the dealer is required merely to furnish a statement showing what, according to his computation, is due by him to the grower, or does it mean that when he comes within the operation of the act by applying for and being awarded a license he is bound to pay as well ?
“We take up this matter initially because it appears from the order entered by the Circuit Judge that he construed the language favorably to appellee and thus decided the case on the merits, thereby obviating a determination of ‘grave’ constitutional questions which he thought would present themselves by the operation of relevant portions of the law were the requirement ‘to account’ held to include an obligation also to pay a balance shown by the account to be due. * * *
“We do not agree that a dealer may comply with the law simply by furnishing to those from whom he purchases fruit statements of the dealings showing balances which result from his own computations; * * *
‡ ‡ £ sfc ‡ ^
“ * * * It requires no strained definition to hold that he who accounts must pay. In view of the object sought to be accomplished by the legislature, *354 we think this meaning is implicit in the phrase used.”
The Court then stated:
“We do not feel obligated now to pass upon the validity of the provisions that if suit becomes necessary to adjudicate the claim, the party who was successful before the Commissioner shall not be liable for costs; that the findings and order of the Commissioner shall be prima facie evidence of the facts they contain, and the prevailing party shall recover his attorney’s fee. The courts are chary of deciding constitutional questions where not absolutely necessary, and without appearing to beg the question, we hold that the appropriate occasion for determination of these matters is in a suit, if and when one is brought and the evidentiary value of the Commissioner’s findings and order is challenged and the propriety of the assessment of costs and fees is questioned.”
Subsequently, the Court said:
“In the final analysis the Commissioner’s order in the instant case had only the effect of causing the appellee to forfeit its license in the event he elected not to pay what he owed the grower. We have said, and we reiterate, that a license is merely a privilege to do business and is not a contract between the authority granting it and the grantee, nor is it a property right, nor does it create a vested right. See syllabus by the court, No. 4, Prettyman, Inc., v. Florida Real Estate Commission ex rel. Branham, 92 Fla. 515, 109 So. 442.”
At approximately the same time that the Commissioner of Agriculture was considering the case of Mayo v. Market Fruit Company of Sanford, Inc., supra, he also had before him the case of Mayo v. Lent, supra, which case was held in abeyance by the Circuit Court on certiorari until the Supreme Court decided the Mayo v. Market Fruit Company case. Subsequently the Supreme Court affirmed the order of the Circuit Judge quashing the order of the Commissioner. See Mayo v. Lent, supra.
Justice Thomas also wrote the opinion of the Supreme Court in Mayo v. Lent, supra [45 So.2d 880 ], and stated the facts as follows:
“The Commissioner of Agriculture received from the appellant-grower a complaint that appellees had entered into an agreement to purchase her oranges at $1.50 a box, had given her a check for $250 as a binder, and then had reneged, so' that she was compelled to sell the fruit to some one else at one-third of that amount.
“When the complaint reached the commissioner he served notice on the appellees to reply to a formal charge that they had ‘failed and refused truly and correctly to account’ for the fruit.”
The Commissioner of Agriculture decided that a contract existed and entered an order that the appellees pay to the grower the sum of $2,985, or in default, that their license be suspended, which amount was computed by multiplying the number of boxes by one dollar and crediting the payment of $250.
The Court then said:
“ * * * After the opinion in the cited case was rendered the circuit court quashed the order of the commissioner, having the view that we had definitely held ‘the Commissioner exceeded his authority in ascertaining and requiring payment by the packer of the loss sustained by the grower as a result of his breach of contract to harvest and pay for fruit, as distinguished from a failure to pay for fruit actually harvested and received by the packer.’
“We have re-examined the opinion and the original file in the case of Mayo v. Market Fruit Company, supra. Although such a distinction was drawn, *355 we did not undertake to decide the commissioner’s authority to discipline a dealer for breach of contract.
“About the only feature common to both cases seems to be the construction ■of the words ‘to account/ which we positively held to mean not only the furnishing of a statement but also the payment of the balance shown to be due. It will be recalled that the charge in the instant case was a failure of the packers ‘to account.’ In the cited case we decided that the commissioner had the authority to require the payment for the fruit actually picked and to discipline the packers for their default in this regard. We took exception, however, to the manner of arriving at the amount due. * * *
* * * sk * *
“In fine, the effect of that opinion was that the commissioner could discipline the buyer not only for failure to furnish a statement but also for failure to pay for the fruit shown by his own statement to have been received, and that the buyer was entitled to credits for the cash paid for fruit received and for the earned portion of the deposit.
“In the instant case we have different facts. As we have said, it is not very clear what the arrangement between the buyer and the seller was. About the only point in which they are in accord is that the check for $250 was delivered by the former to the latter. We can arrive at how this payment was to be applied only by conjecture. One fact seem clear, and that is that the buyer received no fruit whatever, therefore that he could not be penalized for failure to furnish a statement or to pay the amount indicated in such a statement to be due, under the interpretation of the cited case.
“Whether the Commissioner of Agriculture has the power to punish for a breach of a contract determined by him to have been committed is a point of law which we leave for the future, as that was not the specific charge here.
“In the instant case we are impelled to the view that the charge the appel-lees were required to meet did not furnish a basis for the order entered, and consequently we approve the circuit judge’s order quashing it.”
The case of Mayo v. Market Fruit Company of Sanford, Inc., supra, and the case of Mayo v. Lent, supra, were based on subject matter that took place before the passage of Chapter 25149, Acts of 1949, F.S.A. § 601.01 et seq., which act broadened the authority of the Commissioner of Agriculture to discipline citrus fruit dealers. Section 64 of Chapter 25149 (The Florida Citrus Code of 1949) provides:
“It is unlawful in, or in connection with, any transaction relative to the purchase, handling, sale, and accounting of sale of citrus fruit: * * *
“(4) For any citrus fruit dealer to make, for a fraudulent purpose, any false or misleading statement concerning the condition, quality, quantity, or disposition of, or the condition of the market for, any citrus fruit which is received by such citrus fruit dealer, or bought or sold or contracted to be bought or sold by such citrus fruit dealer; or the purchase or sale, of which is negotiated by such citrus fruit dealer; .or to fail or refuse truly and correctly to account and make full payment promptly in respect of any such transaction in any such citrus fruit to the person with whom such transaction is had, or to fail or refuse on such account to make full payment of such amounts as may he due thereon, or to fail without reasonable cause to perform any specifications or duty, express or implied arising out of any undertaking in connection with such transaction; (italics ours).”
*356 The part above italicized of the Florida Citrus Code was added to Section 596.11 (4), which Statute was under discussion in the cases of Mayo v. Market Fruit Co., Inc., supra, and Mayo v. Lent, supra.
We have examined the transcript that was before the Judge of the lower court on certiorari to determine whether or not there was sufficient evidence before the Commissioner for the lower court Judge to sustain the Commissioner’s order.
Ed Hudson, a witness for the grower (Conoley, the appellee here) identified the contract which has been signed by both Conoley and Driskell Townsend, the President of the Townsend Fruit Company. Hudson stated that he was present when the contract was signed by both parties, that áfter Townsend had signed it he delivered the contract to Conoley. On cross-examination by the attorney for Townsend, this question was asked:
“Q. Mr. Hudson, was the picking date of January 10, 1956 in that contract when Mr. Townsend signed it? A. No sir.
“Q. Mr. Hudson, as a matter of fact, when you got Mr. Townsend to sign the contract it wasn’t anything in that contract, was there, except Townsend’s signature? A. Yes sir, the form was filled all except the date, picking date.
“Q. In other words, it is your testimony that it’s just like it appears here when Mr. Townsend signed it, except the figures, January 10, 1956 was not there? A. Right, yes sir.”
Later, on being recalled, Mr. Hudson testified as follows:
“Q. Mr. Hudson, is it your testimony that you don’t know who you talked to that day on the telephone or you do not remember talking on the telephone? A. I do not remember talking on the phone. I remember Mr. Conoley getting a call and he and I discussed the call but I didn’t — I don’t remember talking on the phone.
“Q. What was the nature of the call ? A. Mr. Conoley said there was someone on the phone. Townsend was the man, or somebody on the phone that wanted to know if it will be all right to pick the next day, start picking the next day.
“Q. What was your reply to that? A. I don’t recollect having a reply. As to what it was I don’t, to my knowledge I don’t remember it, what the reply was.
“Q. Now, you have previously said that Mr. Townsend did sign the contract? A. That’s right.
“Q. And the only thing left in blank was the picking date. Is that correct? A. That’s correct.
“Q. And he delivered this contract to you for your accomodation or for you to purchase the fruit? A. How about stating that again.
“Q. Well, he let you use his contract to go out and purchase this fruit. Is that correct? A. I didn’t say that.
“Q. Well, what did you have the contract for? A. To purchase that crop of fruit if a favorable picking date could be acquired.
“Q. Did you tell Mr. Conoley that there was any if about the contract? A. No.
“Q. But you had the contract executed by Mr. Townsend? A. Yes.
“Q. And you didn’t disclose to Mr. Conoley anything about the picking date? A. The picking date was discussed. He wanted it picked by the 10th.
“Q. And you didn’t tell Mr. Con-oley then that Mr. Townsend wouldn’t *357 accept the contract unless a specific date was had for picking? A. No, I didn’t tell him that.
“Q. Mr. Hudson, when did Mr. Hughes come into this particular transaction? A. You want the date?
“Q. Yes. A. I called Mr. Frasure Hull who is working in the capacity as a broker, in regard to the crop of fruit that was for sale and that’s how Mr. Hughes got into it. He had been buying fruit for Mr. Hughes.
“Q. Mr. Hull had been buying fruit for Mr. Hughes? A. As a broker, yes sir.
“Q. As a broker, I don’t believe, Mr. Hudson, I don’t believe you really answered that last question. We asked you when Mr. Hughes came into the picture. Was it prior to the time the contract was signed? A. No, it was a couple of days afterwards.
“Q. Now, did you notify Mr. Townsend later that Mr. Hughes had entered the picture? A. What do you mean later?-
“Q. After the contract was entered into and after the fruit was picked or at any time. A. He was notified after the fruit was picked.
“Q. Did you have any arrangement with Mr. Townsend that you could dispose of the fruit for him? A. You mean was I authorized to do that?
“Q. Yes. A. There was no conversation between Mr. Townsend and I as to who was actually to pick the fruit or who was to buy it.
“Q. But in general you were to dispose of the fruit. Is that correct? A. That was my intention, yes.
“Q. And that was your understanding with Mr. Townsend? A. It wasn’t mentioned to him until a later date.
“Q. Well, isn’t it true, Mr. Hudson, that Mr. Townsend allowed you to use his name so that you could buy fruit? A. He signed the contract for me to buy the crop.” .
Mr. E. B. Conoley testified that the fruit' shown in the contract was picked, that they started on the 6th of January. He testified from tickets that he had that there was 4,118 boxes, and that he had been paid a deposit of $500, that he did not know who actually picked the fruit, as a grove man delivered to him some tickets that were from the Adams Fruit Company and some from the Hughes Fruit Company. Mr. Conoley was asked:
“Q. You sold your fruit to Ed Hudson, did you not ? A. No sir. ’
“Q. He was the only man you ever talked to wasn’t he? A. .No sir.
“Q. Who else did you talk to? A. I talked to a man over the telephone, called himself Mr. Townsend, the same time Mr. Hudson was in my office, the same day I signed the contract.
“Q. Was that after the fruit was picked or before? A. That was the day the fruit was picked and the contract was delivered to me.
“Q. You talked to Mr. Townsend over the telephone ? A. I said I talked to a man that said his name was Townsend, long distance.
“Q. You don’t know whether it was this man or not? A. I couldn’t swear it was that man because I didn’t see him.
“Q. What was that conversation? A. He wanted to know if he could start picking that day. And I said, ‘Just a minute,’ and Mr. Hughes and Mr. Hudson was standing right side of the desk. And in my little office.
“Q. Who placed that call? A. I don’t know who placed the call. I received it at the other end.
*358 “Q. How did you get on to the conversation, then? You didn’t pick up the phone and the man on the other end said his name was Townsend, did he? A. Mister, I don’t know how the telephone company operates but my telephone rang and I answered it. He said, ‘This is Mr. Townsend. Is it all right if we start picking your fruit today?’ I says, ‘Mr. Townsend, your man is in here now; Mr. Hudson.’ And. we signed the contract. I said, ‘Go ahead and pick it. Go ahead and pick it.’ I said, ‘Just a minute and I’ll let you talk to Mr. Hudson,’ I give the telephone to Mr. Hudson. Now, I don’t know what they said.
“Q. And was that the date the contract was signed ? A. That is the date I signed the contract.
“Q. What date was that? A. It was on January 6th, Friday.”
Mr. Hudson subsequently stated that he made the $500 down payment that Conoley received.
Mr. Townsend denied making the telephone call and picking the fruit or authorizing it to be picked. Mr. Hughes testified that he bought the fruit through a Mr. Hull, a broker, and hired the fruit picked.
We are of the opinion that the Commissioner had sufficient evidence before him to determine that a valid contract had been entered into between the Townsend Fruit Company and Conoley, and that title to the fruit passed to the Townsend Fruit Company at the time of the execution of the contract. From this testimony the Commissioner could have determined that Townsend gave Hudson a completed, filled out contract on Townsend forms with nothing remaining in the contract to be completed except the picking date for the fruit ; that Hudson contacted Conoley, at which time Conoley and Hudson, or one of them, filled in the blank places in the contract for the picking date to make it the 10th of J anuary.
The Commissioner could also have determined from the evidence that Townsend owned the fruit and Hudson, as his agent, had contacted a broker, who in turn sold the fruit to Hughes, who had the fruit picked.
On certiorari, the lower court does not determine the weight of the evidence, but “the reviewing court does not reweigh or evaluate the evidence but merely examines the record to determine whether the tribunal or agency had before it competent substantial evidence to support its findings and judgment, which also must accord with the essential requirements of the law.” DeGroot v. Sheffield, Fla., 1957, 95 So.2d 912.
The Supreme Court in Mayo v. Lent, supra, said:
“When the complaint reached the commissioner he served notice on the appellees to reply to a formal charge that they had ‘failed and refused truly and correctly to account’ for the fruit.”
The Court then held:
“In the instant case we are impelled to the view that the charge the appel-lees were required to meet did not furnish a basis for the order entered, and consequently we approve the circuit judge’s order quashing it.”
In the case now before this court the Commissioner notified Townsend Fruit Company that a complaint had been filed against it with the Commissioner, stating:
“This Complaint sets forth that: You have failed and refused truly and correctly to account and make full payment promptly for citrus fruit purchased from the petitioner during the 1955-1956 season.
“Pursuant to Chapter 601.66, Florida Statutes [F.S.A.], a copy of this complaint is hereby referred to you and you are called upon to satisfy the complaint or to answer the same in writing *359 to the Commissioner of Agriculture not later than Feb. 4,1956.”
The complaint referred to and made a part of the notice stated:
“Dear Mr. Mayo:
“Mr. E. B. Conoley, as agent for the complainants, on January 3 entered into contract with Townsend Fruit Company, Inc. to sell 4,000 boxes of fruit at $1,60 per box on the tree. A copy of this contract is attached hereto and made a part hereof.
“Townsend Fruit Company picked 4,118 boxes of fruit between January 6, 1956 and January 16, 1956, and thereby became indebted to the complainants in the sum of $6,588.80, of which $500 was paid to the complainants when the contract was made. No further monies have been received by complainants. We will be glad to furnish you further information that you may request, but we wanted to make this complaint to your office so that you might take appropriate action. Yesterday we filed a complaint in the Orange County Circuit Court on this transaction and have voluntarily dismissed the same today so that you might have jurisdiction of the complaint.”
So it will be seen that the complaint on which the defendant responded at the hearing before the Commissioner included not only a statement that the defendant, Townsend Fruit Company, had refused to make full payment for the citrus fruit purchased from petitioner, but it included the details of the contract.
The Lent case is easily distinguishable from the instant case. In the Lent case, the fruit had not been picked, while in the instant case, as determined by the Commissioner, it had. At the time of the Lent case, the broadened provisions of the statute quoted were not applicable to it, while in the instant case the broadened provisions apply. Moreover, in the instant case, Townsend Fruit Company was bound by the acts and conduct of its agent, Hudson, and his acts in the main produced the situation about which this controversy arose. To hold that Townsend should escape would penalize the innocent party to the contract who had not brought about such situation.
Townsend Fruit Company, Inc. and Driskell Townsend, its President, answered the complaint, and the hearing hereinabove referred to was conducted by the Commissioner. No objection was made to the notice by the defendants, nor to the form of the complaint at the hearing before the Commissioner or the procedure pursued, but rather the appellants, by their answer and actions, submitted the controversy outright for determination on its merits, and even so we are not called upon to determine at this late date the sufficiency of the complaint upon which the defendants were tried before the Commissioner. If the Commissioner had sufficient evidence before him to determine that the Townsend Fruit Company had purchased the fruit involved from Conoley, as trustee, and the amount due the trustee for this fruit, and we so hold, the question then arises whether or not the Commissioner had the authority under Section 64(4) of Chapter 25149, Acts of 1949 (Section 601.64(4), Florida Statutes 1955, F.S.A.), to order Townsend Fruit Company, as a citrus fruit dealer, to pay the said sum of money, or in default thereof, to have its license revoked. The record does not disclose any attack on the validity of the statute above mentioned. A reference to this section, which we have heretofore quoted in this opinion, convinces us that the Commissioner had such power. The referred to Section makes it unlawful in connection wtih the purchasing, handling or sale of citrus fruit “to fail or refuse truly and correctly to account and make full payment promptly in respect of any such transaction in any such citrus fruit to the person with whom such transaction is had, or to fail or refuse on such account to make full payment of such amounts as *360 may be due thereon, or to fail without reasonable cause to perform any specification or duty express or implied arising out of any undertaking in connection with any such transaction;”.
We are not concerned with that part of Section 601.66, which, in the event the citrus fruit dealer does not comply with the Commissioner’s order to pay, authorizes a suit in the proper Circuit Court for the total sum of money found due by the Commissioner, and which makes such sum prima facie correct. Any question as to these provisions of the above section of the statute can only arise on proper appeal in a suit based on such provisions.
We, therefore,' affirm the order of the lower court in quashing: the writ of certio-rari.
KANNER, C. J., concurs.
PLEUS, J., dissents.